### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

_____

LUISA H. HOLDEN,          )
          *Plaintiff*    )
                 )
     v.            )
                 )
                 )
CLIVE CARDOZO, ET. AL.   )        CIVIL ACTION No. 04-11657-RGS
          *Defendants*   )
_____)

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION FOR RELIEF FROM JUDGMENT, PURSUANT FED. R. CIV. P 60(b)(6)

#### *INTRODUCTION*

This memorandum is presented by the Plaintiff in support of her motion for relief from judgment. Plaintiff commenced and previously prosecuted this case *pro se*, notwithstanding the complex jurisdictional questions raised by her pleadings occasioned by what was effectively as the wrongful kidnapping of her child from this jurisdiction. In short, her entire case was construed as an attempt to have the Federal Court order the return of her child to her care and custody in Massachusetts in conflict with a New York State Court determination purporting to grant custody to Clive Cardozo. There have been recent cases including *Marshall v. Marshall,* 126 S.Ct. 1735 (2006), that have further circumscribed the jurisdictional limitations. The dismissal of her claims, however, premised on jurisdictional grounds, failed to address issues of federal law which this court should now undertake to determine to afford justice to the parties here and properly recognize Ms. Holden's constitutional rights. Thus, further consideration by this court into the gravamen of the Plaintiff's complaint is respectfully requested.

I.     *SUMMARY PROCEDURAL AND FACTUAL BACKGROUND*

As context for the resolution of the constitutional and federal questions discussed below, Ms. Holden provides the following summary factual background. [1] This unfortunate situation begins in 1999 when the plaintiff, Ms. Luisa Holden, obtained a Order of Protection against Clive Cardozo for the benefit of her son, Quinn Holden.[2] In September, 2000 Ms. Holden was given permission by the New York Family Court to relocate to Massachusetts with her son although the court indicated that it would maintain jurisdiction, notwithstanding the permitted physical relocation of the child from its jurisdiction.

Ms. Holden and her son Quinn went to Weston, Massachusetts where he was enrolled in the public school system for three and a half years.

In June, 2002, almost two years later, after several days of hearings in the New York Family Court, Ms. Holden was granted custody of Quinn, but told that she should return to New York. Over the course of the next year there was considerable wrangling in the Family Court during which Ms. Holden appeared mostly *pro se.* She and her son, however, continued to reside in the Commonwealth of Massachusetts and he continued to attend school there and establish his contacts there.

On April 15, 2003, the New York Family Court entered a default judgment against Ms. Holden finding her in contempt of court as well as, seemingly as a punishment, transferring custody of Quinn to Clive Cardozo. [3] Ms. Holden has repeatedly

---

[1] Copies of various certified court documents and other information have been presented throughout this matter by Ms. Holden and any referenced documents we believe are incorporated already in the case file.
[2] This Order led to an Order of Support being entered for the benefit of Quinn Holden, notwithstanding that Ms. Holden never so requested and that there never was an evidentiary determination of paternity.
[3] This order on custody purporting to change it from Ms. Holden to Mr. Cardozo, was entered by default at the same time that the Court found Ms. Holden to be in contempt, notwithstanding the June, 2002 custody order in her favor which was entered after seven days of hearing and determined that it was in the best interests of the child to be with his mother. In making this change, the Court acknowledged that it was not

asserted through all the various proceedings that she never received notice of the April

15th hearing.[4]

Subsequently, she did appear upon the advice of a lawyer on May 15, 2003 at

which time she was sentenced to a jail term when the Court changed the custody order for

the benefit of Clive Cardozo, notwithstanding the Court's order that he must seek

psychiatric assistance for the transfer.

On June 6, 2003, Clive Cardozo acting with personal friends of his, and after

consultation and with the assistance of the Weston Police, went to Quinn Holden's fifth

grade classroom at the Field School in Weston, Massachusetts and physically removed

the child from school and flew him back to New York in a private plane. This child's

seizure against his will, he physically and verbally resisted as witnessed by Ms. Holden

and others, occurred with absolutely no involvement of the Massachusetts judiciary, the

home state of the child. Mr. Cardozo made no effort whatsoever to seek and obtain the

authority of the Massachusetts Probate Court to remove the child from the

Commonwealth. In fact, at the time of the "kidnapping", he did not have any proper

authorized documentation from the New York Court on which to base his actions. Ms.

Holden has presented to this Court and other courts evidence of her son Quinn's distress

and failed efforts to avoid going with Mr. Cardozo.

Subsequent to the wrongful taking of Quinn, Ms. Holden both undertook to have

the New York Court reconsider it's actions and sought the assistance of the

Massachusetts Probate Court as that Court had apparent jurisdiction as a result of Quinn's

more than three-year residence in Massachusetts. Both efforts were to no avail. The New

---

in the best interests of the child.
[4] The Affidavit of Service was on a "John Doe". There was no personal service on Luisa Holden which
should have voided the default. Having acted on an unsigned Order to Show Cause without proper service,
the Court of New York did not allow relief under CPLR § 5015 which provides relief from judgments.

York Court maintained its position adverse to Ms. Holden. Despite her admonitions to the Massachusetts Probate Court to take action to protect the interests of her Massachusetts resident son, the court by several orders in August through December, 2003 repeatedly declined to entertain her requests. The Court asserted it had no subject matter jurisdiction, based upon the New York Court's assertion of jurisdiction.

There is no record whatsoever of any of the communications between the courts of the two states that should have transpired to make the proper determination of whether jurisdiction could be had in Massachusetts.

Thus, on July 26, 2004, Ms. Holden turned to this court to vindicate what she perceived to be a severe violation of her constitutional rights to be with her son and her due process rights to have the opportunity to protest the wrongful removal of her son from the jurisdiction of Massachusetts. In addition, there was no adequate, timely remedy for this extraordinary circumstance in the state courts below.

## II.    *ISSUES OF FEDERAL CONCERN*

Although Ms. Holden's pleading varied in its allegations, given the indulgence that the court should have given her as a *pro se* plaintiff, [5] her original complaint, *inter alia,* identified the following issues of significant federal concern[6]:

1.)    Ms. Holden properly invoked diversity jurisdiction pursuant to 28 U.S.C. § 1332 at least in so far as it related to claims against the defendant, Mr. Cardozo, admittedly a resident of New York. (Complaint ¶ 6)

2.)    Ms. Holden undertook to invoke jurisdiction under 42 U.S.C. § 1983

---

[5] *See Haines v. Kerner,* 404 U.S. 519, 520 *reh'g denied* 405 U.S. 948 (1972) (holding *pro se* complaint to be "less stringent standards than formal pleadings drafted by lawyers")

[6] This request to have the court reconsider questions of federal jurisdiction and of federal significance, attempts to isolate these points from the other various allegations previously made by Ms. Holden regarding her various counsel and other defendants

insofar as it related to the actions of other individuals purporting to act under the color of state law in the abduction of her son. [7]

3.)    Ms. Holden specifically invoked the Federal Kidnapping and Prevention Act (28 U.S.C. § 1738A) properly noting its purpose at creating uniformity amongst the states as opposed to invoking it as a form of jurisdiction to resolve conflicting court orders. (Complaint ¶ 26.)

4.)    Ms. Holden did undertake to try to identify severe wrongful conduct - "gross negligence" and ruthless endangerment – on behalf of the Weston Police Department so as to properly plead a charge under 42 U.S.C. § 1983. (Complaint ¶ 21, 23.)

5.)    Ms. Holden invoked the federal issue of what is proper due process in removing a child from one jurisdiction to another by noting the absence of any authenticated documentation or any filing, hearing or proper judicial procedure in the Commonwealth of Massachusetts before the child was physically removed. (Complaint ¶¶ 23, 25-26.)

In addition, in response to the Court's Memorandum and Order to Show Cause dated August 25, 2004, Ms. Holden presented the following additional questions of federal concern [8]:

1.)    Ms. Holden specifically identified the need to construe the Federal Parental Kidnapping Act (28 U.S.C. § 1738A) consistently for the uniform and proper implementation and enforcement of out of state

---

[7] Ms. Holden did not join, however, the private individuals who assisted Clive Cardozo under the color of an unverified New York Court order. The issues regarding immunity raised by the Court in its various responses to Ms. Holden's prior filings are recognized.

[8] See Luisa Holden's "Response to Memorandum and Order to Show Cause, Summary Complaint and Motion, dated September 13, 2004 filed with the Court as Document 17 on September 14, 2004.

custody orders consistent with federal due process. (Response, pp.16 ¶ 17). Although the substantive issues in custody orders may be deemed to be questions of state concern, there is a strong federal interest in the uniformity of requirements for the implementation and enforcement of orders. Also, the requirements of what a custody order must bear, a seal and certification attesting it as a true copy on file.

2.)     Ms. Holden questions her son's removal without a hearing under constitutional case law of federal due process. (Response pp. 5-6)

In sum, despite the technical pleading deficiencies that the *pro se* Plaintiff's initial filings contained, affording due deference to her *pro se* status, she did raise bona fide questions of federal law specifically related to the proper means by which courts are to afford full faith and credit under 28 U.S.C. § 1738A and afford the required due process required in the factual circumstances and by pleadings in this case.

## III.     *NATURE OF THE RELIEF UNDER FED . R. CIV. P 60(b)(6)*

Federal Rules of Civil Procedure (60)(b) provides six basic categories by which the court may grant relief from judgment. Subsections (1) through (3), allow a remedy for inadvertence, excusable neglect, newly discovered evidence, fraud, and misrepresentation or misconduct of an adverse party. Subsections (4) and (5) afford relief if the judgment was void or satisfied, released or discharged. In this case, the Plaintiff seeks relief under subsection (6), which allows the court to grant such relief for "any other reason justifying relief from the operation of the judgment." Unlike the first three parts, subsection (6) motions need not be brought within a year, but only within a reasonable time. *Gonzales v. Walgreen's Co.,* 918 F.3d 303, 305 (1st Cir. 1990). [9]

---

[9] While there has been some passage of time since the decision by the First Circuit Court of Appeals, the

Recognizing that the relief sought here is not easily granted, it must be stressed that the Plaintiff's principal concerns were dismissed on subject matter jurisdiction grounds. In part, this apparently resulted from the court's focus on the bereaved mother's strident plea for the return of her child. Thus, in the Memorandum and Order to Show Cause, dated August 25, 2004, the Court noted: "Holden's complaint in essence asks the court to invalidate the orders of the Suffolk County, New York Family Court, award her custody of her son, and, compensate her for pain and suffering." By so summarizing the *pro se* Plaintiff's varied allegations, the Court invoked the so called "*Rooker-Feldman*" doctrine as the court deemed the challenge by the plaintiff as seeking the reversal of a state court decision.

Furthermore, the court also invoked a lack of subject matter jurisdiction, based on the "domestic relations exception" citing to *Ankenbrandt v. Richards,* 504 U.S. 689, 703 (1992). Thus, it must be stressed that the court's denial of relief to the Plaintiff was primarily based on subject matter jurisdiction grounds. This is not the equivalent of a judgment on the merits nor does it provide the basis for claim preclusion or *res judicata. See Moore's Fed.Pract. 3d.,* § 12.30[2] at page 12-36.2. *See Thompson v. County of Franklin,* 15 F.3d 245, 253 (2nd Cir. 1994). Accordingly, if a basis for subject matter jurisdiction can be shown, then those claims may still be adjudicated on the merits.

For the purposes of the court's consideration of this Rule 60(b)(6) motion, the fact that the *pro se* Plaintiff was denied relief because of difficult jurisdiction issues, the motion should be weighed by the court in her favor and considered as a part of the

---

Plaintiff in her *pro se* capacity has been continually diligent in attempting to pursue her remedies. Nonetheless, her repeated efforts at seeking reconsideration in New York and in Massachusetts state courts have been to no avail. As this court knows, the Plaintiff has maintained her single minded persistence in identifying and raising due process issues inherent in her case.

required special circumstances that permit such relief. There are sufficient allegations by the Plaintiff presented in the court pleadings to withstand the challenge to subject matter jurisdiction so as to permit this court to review and determine on the merits whether the Plaintiff was afforded her proper due process rights. The jurisdictional barriers identified by the court discussed below, need not bar judicial scrutiny of the constitutional level due process issues raised by the Plaintiff that focus on the manner by which her son was removed from her and his home jurisdiction.

IV.    <u>*CLAIMED BARS TO JURISDICTION*</u>

A.   <u>The Domestic Relations Exception Does Not Preclude Jurisdiction</u>

In proceedings before this court, the *pro se* Plaintiff's strident quest for return of her child no doubt led the Court to deem the case nothing more than a "child custody dispute" and to determine that there was no subject matter jurisdiction, citing to *Ankenbrandt v. Richards, supra.* Since then, however, The United States Supreme Court has decided *Marshall v. Marshall,* 126 S.Ct. 1735 (2006) that further narrowed the "exception" to jurisdiction, as recognized by newer First Circuit cases as well. As noted in Section III, *infra.,* the complaint invoked bona fide due process questions of federal law that are not subject to dismissal under the now limited *Ankenbrandt* aegis.

In *Ankenbrandt,* the Supreme Court reviewed the district court's dismissal of a law suit premised on the proposition that "the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States."….504 U.S. at 692. It was deemed by the District Court to be the "domestic relations exception" to diversity jurisdiction and the seriousness of the federal questions raised. [10] Similarly, the court also noted that abstention was inappropriate in the

---

[10] In *Ankenbrandt,* the petitioner brought an action against her ex-husband on behalf of her two daughters

case. *Id.* at *706.* [11] Put another way, there is no absence of federal jurisdiction in matters between husband and wife or related to custody proceedings so long as it does not involve the issuance of a divorce, alimony or custody order.

In its mandate in this case, the First Circuit cited *Ankenbrandt* as well as *Dunn v. Cometa,* 238 F.3d 38 (1st Cir. 2001), claiming basically that this case was brought to reverse a New York custody order. In *Dunn,* the First Circuit held that the so-called "domestic relations exception" did not apply in the case brought by a father and his disabled son against the former wife for various tort claims. Regarding the so-called "domestic relations exception" used by the *Ankenbrandt* Court, the First Circuit outlined its limited and narrow construction:

> "In general, lawsuits affecting domestic relations, however substantial, are not within the exception, unless the claim at issue is one to obtain, alter, or end a divorce, alimony or child custody decree." *Dunn v. Cometa, supra at 41.*

*See also Whatley v. Whatley,* 396 F.Supp.2d 50, 57-58 (D.Mass 2005). (Citing cases showing the exception is only applicable in a very narrow set of circumstances). The trend is towards not overly restricting this federal jurisdiction.

More recently, the Supreme Court has confirmed the limited scope of the exception. *See Marshall v. Marshall,* 126 S.Ct. at 1746 ("We nevertheless emphasized in *Ankenbrandt,* that the exception covers only a narrow range of domestic relations issues.") There, the Court noted that the "domestic relations exception" was "not

---

claiming sexual and physical abuse and seeking among other things monetary damages. The court reviewed the history of the so-called "domestic relations" exception and found that it only existed as a matter of statutory construction. 504 U.S. at 700. However, contrary to the ruling below that had deemed "the whole subject of domestic relations" as beyond the jurisdiction of the Federal Courts, the Supreme Court restricted the scope of the exception by holding that it only "divests the Federal Courts to issue divorce, alimony and child custody decrees." 504 U.S. at 703.

[11] In so ruling, the court stated: "abstention should rarely be invoked, because the Federal Courts have a 'virtually unflagging obligation…to exercise the jurisdiction given them.' " 504 U.S. at 705.

compelled by the text of the Constitution or federal statute". 126 S.Ct. at 1741. The Court also construed prior case law to recognize federal jurisdiction over enforcement as opposed to issuance of an alimony decree. *Id.* at 1746.

B. The "Rooker-Feldman Doctrine" Does not Control The Allegations Made by Ms. Holden Concerning Her Due Process Rights.

Obviously, Ms. Holden wanted the return of custody of her son from the moment Clive Cardozo, absent a registered court order, and absent any documented communication between the Massachusetts judiciary and New York judiciary, physically took Ms. Holden's son Quinn, and hijacked him to New York. Recognizing this obvious concern of the *pro se* Plaintiff, the Court interpreted the complaint to be simply a request for the overturn of the improvidently allowed custody order granted by default and, thus, determined that her claim was beyond its jurisdiction because of the "Rooker-Feldman Doctrine".

The latter construct of prior and varied case law, effectively states that a federal court will not exercise jurisdiction to conduct a direct review of a state court judgment. *See Picard v. Members of Employee Retirement Board of Providence,* 275 F.3d. 139, 145 (1st Cir. 2001) (cited in the First Circuit's Mandate in affirming the district court's declination of jurisdiction.) In what was characterized as a "text-book" application, the Court in *Picard* simply stated that the doctrine "prohibits federal, district and circuit courts from reviewing state court judgments." *Id.* at 145. Thus, when federal issues are "inextricably intertwined" with claims determined in the state court, the federal courts will not invoke its jurisdiction. Being "inextricably intertwined" is premised upon whether or not the state court's judgment must be deemed wrong for the federal claim to succeed. *Id.* Notwithstanding Ms. Holden's *pro se* mission to obtain custody, the resolution of the due process and federal issues involved in the removal of the minor

Quinn Holden to New York without explicit judicial authority, may be adjudicated without any direct reversal of a bona fide state court judgment, and without running afoul of "Rooker-Feldman".

The earlier dismissal of this action for lack of jurisdiction, premised on the "Rooker-Feldman Doctrine", requires a fresh look in light of more recent Supreme Court pronouncements. *See Federacion Maestros De Puerto Rico v. Junta de Ralaciones del Trabajo de Puerto Rico,* 410 F.3d. 17, 19 (1st Cir. 2005). There, the First Circuit went through an extended discussion of the "Rooker-Feldman Doctrine" as it was recently limited and construed by the United States Supreme Court in *Exxon Mobile Corp. v. Saudi Basic Industries Corp.,* 1544 U.S. 280, 125 S.Ct. 1517 (2005). In *Exxon,* the Supreme Court noted that it had only decided two cases (those from which the name of the doctrine derived), but that the so called "doctrine" has come to be construed "far beyond the contours of the *Rooker* and *Feldman* cases." at 283. Effectively, the so-called "doctrine" is now limited to instances where it is directed to state court judgments that were final and issued prior to the commencement of a federal district court proceeding. Thus, the "Rooker-Feldman Doctrine" did not apply. *See Federacion De Maestros, supra,* 410 F.3d at 23-24. The federal requirements of due process invoked by Ms. Holden, and the requested construction of federal law 28 U.S.C. § 1738A (Parental Kidnapping and Prevention Act) should not have been, and need not have been construed, as lacking jurisdiction under the now narrowed "Rooker Feldman Doctrine". The independent claims regarding the procedural due process rights that need to be afforded to a parent in Ms. Holden's position require a federal forum for proper and uniform determination. *See* Section II, *infra*.

V.     *RELIEF UNDER RULE 60(B)(6) WILL PROTECT MS. HOLDEN'S ESSENTIAL CONSTITUTIONAL RIGHTS THAT HAVE BEEN INFRINGED.*

The crux of Ms. Holden's complaint is that she was deprived due process by the entry of a default order against her, changing her eleven (11) year custody of her son Quinn to that of Cardozo, and holding her in contempt without a hearing. That underlying default order led to Mr. Cardozo's removal of Quinn from the jurisdiction of Massachusetts completely without proper legal process, without the opportunity for a hearing and in express contravention of the federal policies detailed in the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A. The inherent wrong that occurred, happened under the court's radar and can now only be remedied by the extraordinary relief afforded by Rule 60(b).

The seminal decision permitting such extraordinary relief is *Klapprott v. United States,* 335 U.S. 601(1949) determined only a year after the institution of the Federal Rules of Civil Procedure. In *Klapprott*, nine years after becoming a naturalized citizen, the United States sought to set aside a state court order that granted Mr. Klapprott citizenship, claiming that it had been obtained under fraud and that he in fact maintained an allegiance to Germany. Klapprott did not answer the complaint and a default judgment entered against him. Then he was arrested on independent criminal charges. More than four years after the default judgment entered, Klapprott sought relief in the United States District Court to set aside the judgment that had revoked his citizenship. His petition was denied on the ground that there was willful neglect and that it was too late. Detailed in the court's opinion, the petitioner was precluded from earlier action by illness, incarceration, inability to afford an attorney and governmental interference. By acknowledging the extraordinary penalty that loss of citizenship entails, the court was disinclined to permit

the government to proceed on a default judgment, absent sufficient proof by the government. 335 U.S. at 611-612. In analyzing the provisions of Rule 60(b), the court acknowledged that the various reasons that prevented the petitioner from timely acting could not reasonably be categorized under the specific headings of the rule, and thus, determined that his petition should be viewed under the "other reason clause" of Rule 60(b). The court interpreted the rule more broadly than courts had previously viewed post-judgment relief and said it should not be limited by prior vague and strict common law tools. *Id.* at 615.Thus, the court determined that it was proper to invoke the provisions of 60(b)(6) by stating:

> "In simple English, the language of the 'other reason clause' for all reasons except the five particularly specified, vests power in courts adequate to enable them to vacate judgments when ever such action is necessary to accomplish justice." *id.* at 614-615.

Since fair hearings were essential to justice, the court held that to protect Klapprott's critically important rights, the default judgment should have been set aside so that he could have had the opportunity for a fair hearing. Subsequent decisions on the scope of Rule 60(b)(6) demonstrate that its reach is wide and relief requires important issues and extraordinary circumstances. Ms. Holden believes her circumstances warrant such relief.

First, it should be noted that Rule 60(b)(6) is available to cure defective jurisdictional faults. *See LeBlanc v. Cleveland,* 248 F.3d. 95 (2nd Cir. 2001). In that case, the lower court ruled that there was a failure of admiralty jurisdiction and dismissed the complaint. The petitioner sought relief under Rule 60(b)(6) to be permitted to amend her complaint to cure the jurisdictional defect after the dismissal noting that a new action would suffer from a statute of limitations issue as well as a lack of diversity (the basis for the presumed jurisdiction). The Court of Appeals granted relief and noted: "We have held that Rule 60(b)(6) 'should be liberally construed' when substantial justice will thus be

served." 248 F.3d at 100. *Neuman-Green, Inc. v. Alafonzo-Lorrain*, 190 U.S. 826, 831

(1989) (allowing correction of jurisdictional statements under 28 U.S.C. § 1653.)

The First Circuit recognizes that there is no specific time-limit in which to bring a

motion under Rule 60(b)(6), and that it is to be treated separately from the first five

enumerated sub-divisions. *Gonzalez v. Walgreens Co.,* 918 F.2d 303, 305(1st Cir. 1990).

Despite this court's acknowledgement that Ms. Holden "presented a respectful

and, on its face, a compellingly sympathetic case" [12], the court found her allegations

barren of subject matter jurisdiction. *Id.* Despite the sympathy, it does not really appear

that the court properly indulged the petitioner as a *pro se* party, and held her to a stringent

standard in the evaluation of jurisdiction. *See Rhode Island Hospital Trust National Bank

v. Howard Communications Corp.,* 980 F.2d 823, 828 (1st Cir. 1992). In fact, the court

arguably has a responsibility and obligation to protect the *pro se* litigant from his or her

own forfeiture of important rights because of lack of training. *Traguth v. Zuck,* 710 F.2d

90, 95 (2nd Cir. 1983).

It is an extraordinary circumstance where a mother can be physically and

forcefully separated from her child and have him removed from the jurisdiction absent

adequate due process protection. Such circumstances raise significant issues concerning

parents' rights under the United States Constitution. *See Suboh v. District Attorney's

Office* 298 F.3d 81, 85 (1st Cir. 2002). That case, too, involved the intervention of police

and other authorities in a custody dispute. In *Suboh,* the First Circuit acknowledged the

basic constitutional right of "familial integrity", recognized by the Supreme Court. In

*Troxel v. Grandville,* 530 U.S. 57, 65 (2000), the court made clear that the protection

afforded under the Due Process Clause does "more than fairness" while stating:

---

[12] Order, September 30, 2004 by Judge Stearns.

"The liberty interest at issue in this case - the interest of parents in the care, custody, and control of their children – is perhaps the oldest of the fundamental liberty interests recognized by this court. In an extended review of over seventy-five years of precedent, the court made clear that the Due Process Clause protects the fundamental right of parents to make decisions concerning the care, custody and control of their children and noted, in light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *id.* at 66.[13]

Accordingly, in *Suboh,* the First Circuit noted that "this liberty interest is protected both by the substantive component of the Due Process Clause which constrains governmental interference with certain fundamental rights and liberty interests, and by the procedural component of the Due Process Clause which guarantees "fair process"." 298 F.3d at 91.

Here, the threshold for constitutional deprivation has been met "…need no greater justification than they comport with each state's fundamental constitutional commitment to individual freedom and human dignity." *Duchesne, supra.,* 566 F.2d. at 825.

VI.     *THERE SHOULD BE FEDERAL QUESTION JURISDICTION TO DETERMINE THE ENFORCEMENT OF CUSTODY DECREES UNDER 28. U.S.C. § 1738A.*

A.     The Constitutional Interest in Family

There can be no doubt of the significance of the constitutional right of parents to the integrity of their families requiring proper process to compel any changes or force any relocations. Recognition of this as noted in *Troxe, supra.* is virtually universal. Beyond the concept, however, is the practical reality of how these rights can be protected given the intense vagaries of custody battles when opposing sides are seeking the same rights. Fundamentally, this requires due process and was a significant underpinning of

---

[13] *See also, Duchesne, supra.,* 566 F.2d at 825 n.: [The right to family privacy and parental autonomy, as well as the reciprocal liberty interest of parent and child in the familial bond between them, need no greater justification than that they comport with each state's fundamental constitutional commitment to individual freedom and human dignity.]

Congress's enactment of 28 U.S.C. § 1738A so as to provide a uniform enforcement mechanism for child custody decrees under the Full Faith and Credit Clause.

In *Mandell v. Town of Orleans,* 326 F.3d 267 (1st Cir. 2003) this court granted standing and jurisdiction. Armed with an order from the Maryland Court, unlike Mr. Cardozo in this case, the father went to the Massachusetts Probate Court and obtained an *ex parte* order to enforce his Maryland custody judgment. The mother's counter-petition failed. When she did not turn over the children, she was held on kidnapping charges which precipitated her civil rights suit in the United States District court contesting among other things the police's assistance in helping the husband get custody of the children. The court initially enjoined the police from assisting the father.

The court held eleven days of hearing and determined it had jurisdiction. An interlocutory appeal was permitted. The First Circuit refused to apply the domestic relations exception to avoid jurisdiction. *Id.* at 271. The court noted that the issue was "esoteric, but, as federal law increasingly affects domestic relations, one of potential importance". The court did not address the "domestic relations exception" because it determined that the injunction failed by virtue of the "Rooker-Feldman Doctrine", concluding that the District Court's order preventing the children from being taken from Massachusetts directly frustrated the Maryland Court's custody decree. There was thus a direct conflict between the federal court action and the pre-existing state action. The federal injunction against the police prevented them from helping the husband which contradicted the Massachusetts Probate Court's order enforcing the Maryland custody order. In contrast, Ms. Holden's case deserves standing and jurisdiction in the Court, as no enforcement order was obtained, no notice was given and there was no countermanding a state order.

In *Mandell,* while noting the injunctive orders fell within the purview of the "Rooker-Feldman Doctrine", the First Circuit also recognized the critical constitutional issue that is present in this case. Specifically, the court noted that the Massachusetts statutory scheme for implementing custody orders was "virtually mandated by federal law" citing 28 U.S.C. § 1738A. The court identified as a possible constitutional issue the claimed enforcement of the out of state order on an *ex parte* basis.[14] Contrasted with an out of state custodial parent coming to the Massachusetts court to seek enforcement, in the present case, no effort was made whatsoever to obtain enforcement properly under the statute. *See* G.L.c. 209B § 12. And thus, this case addresses more clearly the constitutional due process violation and deprivation.

### B. The Requirements of Due Process

In recognizing the likely constitutional issue, the First Circuit cited to *Morrell v. Mock,* 270 F.3d 1090, 1095-1100 (7th Cir. 2001), *cert denied* 537 U.S. 812 (2002). In *Morrell,* several law enforcement officers on the direction of state attorneys, took the mother's child from her home in Illinois, gave the child to the claimed father who had obtained an *ex parte* order in another state (New Mexico). 270 F.3d at 1092. A custody order entered in favor of the father in New Mexico when the mother did not appear at the hearing (despite service). The mother started her own custody proceeding in a different court. The father traveled to the state where the mother was living and filed the New Mexico order with the local court seeking an emergency enforcement of the New Mexico order. The judge refused to do so without notice to the mother. Nonetheless, absent such a hearing, the father prevailed upon law enforcement officials to assist him and they took the child. The mother soon thereafter went to another judge for relief.

---

[14] The court's concern for this was obviously mitigated by the fact that the *ex parte* order issued by the Massachusetts Probate Court also scheduled a hearing for the next day.

The mother asserted deprivation of due process contrary to her liberty interest, in the companionship, care, custody and control of her child. The Court of Appeals determined that the requirements of due process required notice and an opportunity to be heard in a meaningful time and a meaningful way prior to the removal a child from his home. 270 F.3d at 1095. The Court of Appeals noted the absence of specific case law establishing the proper procedure to enforce an out of state custody. After careful analysis, the court of appeals held that the parent's due process rights require not only a pre-deprivation notice and hearing, but at least an opportunity to object in the enforcing state, especially when the rendering order was by default. 270 F.3d at 1097.

This situation is precisely what obtains here because the original order against Luisa Holden was obtained by default as the evidence she presents shows she never received notice and thus, did not appear at the New York hearing. In so holding, the *Morrell* court noted that there must be some procedure in the enforcing state in order to determine whether the issuing state order is entitled to any weight when the question of jurisdiction has never been determined. *Id.* at 1090. The state statute at issue in *Morrell* (Illinois) derived from the Uniform Child Custody Jurisdiction Act (UCCJA) which is the same basic statute in effect in Massachusetts during the events in this case. It provided for a registration of an out of state judgment by filing a certified copy in the Office of the Court Clerk, whereupon the judgment could be enforced as if it were a judgment by the state court. *Id.* at 1098. *See* General Laws Ch. 209B § 12(a).[15] Under Illinois law, a party opposing the recognition of enforcement is entitled to a notice and opportunity to be heard to question the jurisdictional prerequisites. Considering the various factors, the

---

[15] That section provides: "The certified copy of a custody judgment of another state may be filed in the Office of the Clerk or Register of any court of competent jurisdiction in the Commonwealth. The clerk or register shall treat the judgment in the same manner as a custody judgment of a court of the Commonwealth. A custody judgment so filed has the same effect and shall be enforced in like manner as a custody judgment rendered by a court of the Commonwealth.

court specifically noted the gravity of erroneous deprivations to parents and children alike in concluding that due process requires "at a minimum, pre-enforcement notice and some opportunity to object before law enforcement officials may separate a parent from her children pursuant to an out of state default order transferring custody." (emphasis added) 270 F.3d at 1100. Thus, the court held that the plaintiff had stated a proper claim for lack of due process in the deprivation of her and her child's liberty interest in not being separated. *Id.*[16]

In short, in the instant case, Ms. Holden has in fact plead a proper cause of action for the deprivation of her liberty interest with her child. The factual circumstances here were far more egregious. First, the out of state parent obtained custody through a default judgment. Second, no action whatsoever was taken to file that judgment with a court of competent jurisdiction in Massachusetts, nor to afford the proper opportunity for a hearing and challenge required by *Morrell. See also Glenn v. Myer,* 2002 WL 32345376 (WD Wis. 2002).

The Massachusetts Supreme Judicial Court has recently addressed the issue of what kind of hearing is necessary in order to enforce a foreign custody determination. *Khan v. Saminni,* 446 Mass. 88 (2006). In *Khan,* there was a dispute between a Trinidad couple who had entered a custody determination by consent in Trinidad where the mother took the child and moved to Massachusetts, refusing to return to Trinidad for the ordered visitation. The father came to Massachusetts and filed a petition in the probate court for the enforcement of the Trinidad consent agreement. The mother had previously filed for an *ex parte* order in Massachusetts but went to Trinidad and appeared at a hearing before

---

[16] In spite of recognizing the claim, the court did find that the state actors involved were clothed "with immunity because at the time of their actions, there was no clearly established law to provide them guidance."

its court. The Trinidad Court entered a consent decree related to custody and visitation that she violated by refusing to bring the son back to Trinidad. A hearing was held in the Massachusetts Probate Court that determined under its version of the Uniform Child Custody Jurisdiction Act that the court was obliged to enforce the Trinidad decree. In an effort to have the matter reconsidered and obtain an evidentiary hearing, the mother was afforded a second hearing in the Massachusetts Probate Court. Relying upon the mother's participation in the Trinidad consent decree, the probate court determined that she was not entitled to an "evidentiary hearing" to question the Trinidad decree, also finding that under the Trinidad order she would not suffer a change of custody nor otherwise be deprived of any fundamental liberty interest. 446 Mass. At 460. The court further noted that the father had properly filed the Trinidad decree in the Massachusetts Court in accordance with General Laws Chapter 209B § 12. However, in Ms. Holden's case her liberty interest and a change of custody was at stake.

### C.    The Need for Uniformity

These cases raise the critical issue as to what is the scope of the federal due process required under the PKPA when, despite numerous efforts in conformity amongst the states, there remains no articulated federal guidelines for due process purposes to harmonize the various states' nuances and views regarding "due process". *See Suboh v. District Attorneys Office, supra* at 92 ("Both the right of pre-deprivation process and the right to post-deprivation process are at issue in this case"). Under the Parental Kidnapping and Protection Act, all state courts are mandated to enforce the custody determination or visitation determinations of another state so long as they have been rendered consistently with federal law. 28 U.S.C. § 1738A(a). This mandate obliges each state to afford the requisite federal due process in its determinations. Pursuant to §

1738A(e), before any such "determination" can be made, reasonable notice and opportunity to be heard must be afforded to all parties, including any persons who has the physical custody of the child. In this case, that federal mandate was not afforded to Ms. Holden for the order changing custody that was entered in New York was by default. If notice was given here, the custody would have been ruled invalid and a nullity, as there was no personal service. This would have saved Ms. Holden and Quinn almost four years of pain and suffering due to the loss of their love, companionship and care. This was egregious.

D. Federal Jurisdiction Under the PKPA is Necessary to Accomplish its purposes.

Subsequent to the enactment of the Parental Kidnapping and Protection Act, a variety of cases were filed in federal courts throughout the country invoking its jurisdiction to resolve disputes between states. Some of these arose because of the different nature of the underlying state statutes while others dealt with efforts to properly verify which state had jurisdiction in order to utilize the full faith and credit enforcement procedures of the federal statute. *See Maxie v. Fernandez,* 649 F.Supp 627, 628 (E.D. Va. 1986) (finding federal question jurisdiction under 28 U.S.C. § 1331 and citing cases from the 3rd, 4th, 5th and 11th Circuits holding there was a federal forum to enforce the restrictions of the PKPA).

Notwithstanding this wide spread judicial acknowledgement, in *Thompson v. Thompson,* 484 U.S. 174 (1988), the Supreme Court in construing the PKPA, affirmed a 9th Circuit holding that there was no implied private right of action under the PKPA. 484 U.S. at 178-179. In reaching this conclusion, the court reviewed the failure of the

Uniform Child Custody Jurisdiction Act (UCCJA) [17] The court noted the failure of this approach because of the absence of uniform national standards. Nonetheless, in its effort to provide such uniformity through the PKPA, the court determined that Congress by using its "full faith and credit approach" did not intend that this should be an implied federal cause of action under the statute. On its face, there is no stated cause of action. Rather, the Court construed the PKPA as "a mandate directed to state courts to respect the custody decrees of sister states." 484 U.S. at 183. In sum, the holding in *Thompson* was limited to the non-recognition of an implied cause of action in federal court to determine which of two conflicting state custody decrees is valid. 484 U.S. at 187.

In so holding, the court relied on its own presumption that the states would properly enforce the provisions of the act. *Id.* Unfortunately, this has not followed. Notwithstanding the PKPA's attempt at uniformity, state courts still conflict on significant issues of jurisdiction and due process regarding custody decrees. *See Staats v. McKinnon,* 924 So. 2d 82 (Fla App. 2006). In *Staats,* the Florida court enforced its own order on custody notwithstanding a parallel and conflicting version entered by the court in Tennessee. *Compare Staats v. McKinnon, 206 S.W.3d 532 (Tenn.Ct.App. 2006, appeal denied,* 10/16/2006). The Florida court also denied any further appeal. The Tennessee court entered a contrary custody order by determining that Florida's claim of continuing jurisdiction of its initial custody determination had ceased once the other parent filed his modification petition in the Tennessee courts.

Thus, despite the efforts to have the PKPA provide uniform custody decrees, different states interpreting the same statute nonetheless have come out with totally

---

[17] The New York version of this statute was in effect at the time of the initial custody determinations made in the *Holden* case, and the Massachusetts version (Gen. Laws Ch. 209B) was in effect throughout this controversy.

contrary views: "[N]either  the full faith and credit clause nor the PKPA requires us to adopt the Florida court's interpretation of the UCCJEA and in our view, the statutory text points to the contrary conclusion." 206 S.W.3d at 553. This blatant conflict of state courts interpreting the provisions of the federal statute in different ways, it demands that the federal courts must still exercise jurisdiction under the PKPA at least for the purpose of interpreting it and making sure that its application is uniform across the states.

Otherwise, whoever gets involved in the critical questions of child custody can be left with conflicting orders of state appellate courts and no legal guidance as to how to proceed.

### E.    Due Process Requires a Proper Record

These conflicting state court opinions give rise to a key issue of due process, namely the need to document and record any communications between different states that are trying to reconcile the vagaries of conflicting child custody jurisdictional determinations. The Florida court bolstered its view by the fact that it twice conferred with the Tennessee court and duly recorded its reasons for finding that the Tennessee court was not properly exercising jurisdiction. 924 S.2d at 85-86. To avoid such conflicts at the very least, as determined by the Florida courts, the parties should have an opportunity to participate in any communication between the judges of different states and there should be a record made of such proceedings. *See Chadbic v. Mopoli,* 714 S.2d 1007, 1012, (Fla.App. 1998).

In the instant case, the Massachusetts probate record reflects communications between the Massachusetts court that declined jurisdiction and the New York court. However, there is no record nor any indication as to what the substance of those communications were and accordingly, Ms. Holden had no opportunity to challenge the

propriety of those determinations. *See McCormick v. Oakes,* 899 S.2d 393, 395 (Fla.App. 2005)(requirement of documenting inter-court communication required to determine whether the other state court properly exercised jurisdiction). *See* also *Harshberger v. Harshberger*, 724 N.W.2d 148 (N.D.Supp.Ct. 2006)(proper interstate resolution of custody determinations requires communications between the courts of the two states, which communications should be of record.) at 153. In *Harshberger,* the court noted specifically that "communication between these courts might have prevented the contradictory custody awards-one granting custody to Harshberger and the other granting to custody to foster care in Montana-which is the antithesis of what the UCCJEA was designed to accomplish. *Id*. This is yet another due process issue raised by the lack of uniformity among the states in being able to implement the PKPA. In Ms. Holden's instance, the failure to document any communications between the Massachusetts Probate Court and the New York Family Court leaves undetermined whether or not proper jurisdictional requirements were met.[18]

VII.    *THERE IS FEDERAL JURISDICTION REGARDING THE ISSUES OF DUE PROCESS REQUIRED FOR UNIFORMITY UNDER 28. U.S.C. § 1738A NOTWITHSTANDING THAT ISSUES OF STATE LAW (UNIFORM CHILD CUSTODY ACT) MAY NOT BE INVOLVED.*

As discussed above, Ms. Holden's efforts at vindication of her due process rights in maintaining the integrity of her family, are not foreclosed by the courts prior determinations of the "domestic relations exception" or the "Rooker-Feldman Doctrine". There remains an avenue for federal relief without conflict with these jurisdictional issue precepts. Moreover, this court should recognize federal jurisdiction, notwithstanding the

---

[18] The Massachusetts Probate Court repetitively denied Ms. Holden's motions asserting "no jurisdiction", but apparently based this judgment upon communications with the New York court that are undocumented. *See* Orders of the Massachusetts Probate Court dated August 21, 2003, December 9, 2003, January 30, 2004, April 28, 2005. There was no appropriate legal service of process for a contempt hearing in New York.

various state law claims, because these state law claims implicate significant federal issues. This jurisdictional basis has recently been reaffirmed in *Grabel & Sons Metal Products, Inc. v. Darue Engineering and Manufacturing,* 545 U.S. 308 (2005). The constitutional level of concern manifest and the family, as recognized in *Troxel v. Garville, supra,* affords a strong basis for the courts jurisdiction under the principles annunciated in *Grabel & Sons v. Darue, supra.*

In *Grabel,* the Supreme Court determined that there was federal jurisdiction, notwithstanding any specific federal cause of action, to try claims of title to land because of the implications for federal tax uniformity. The facts in *Grabel* were that the IRS seized Grabel's property in 1994 for tax delinquency. Grabel received actual notice prior to the IRS sale, but took no effort to redeem the property. Five years after the sale, Grabel brought a state action to "quiet title" claiming that the IRS did not follow its notice requirements to the letter. 545 U.S. at 311. The court affirmed the holding that there was federal jurisdiction despite the state law issue. at 311-312. The court relied upon the "long-standing, if less frequently encountered, variety of federal 'arising under' jurisdiction," where federal question jurisdiction will be found over state law claims because they implicate significant federal issues. *Id.* at 312. Describing this jurisdictional basis, the court said:

> "The doctrine captures the common-sense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues…" at 312.

In this instance, this case involves a significant federal question and issue. It is interesting to note that the issue arose in *Grabel* from questions of lack of proper notice (albeit in form as opposed to substance). There is an obvious parallel in Ms. Holden's situation in that she has complained from the outset that the original order in New York

25

transferring custody to Mr. Cardozo was obtained by default, without proper personal

notice and service upon her. Unlike the *Grabel* case, Ms. Holden's situation involved

constitutional questions which the *Grabel* court noted "may be the more likely ones to

reach the level of substantiality that can justify federal jurisdiction". 545 U.S. at 320,

FN7. Although it found federal jurisdiction on the "notice issue" involved in the state

land sale, the Court cautioned against granting jurisdiction where there was the likelihood

of upsetting the state-federal balance. *Id.* at 314. In the case of Ms. Holden's

constitutional due process issues related to the deprivation of her son's companionship,

federal jurisdictional doctrine has already, as discussed above, defined as a narrow path.

Nonetheless, cases like *Staats* and *Harshbarger, supra.,* further demonstrate the need for

a uniform federal forum necessary to implement the federal jurisdictional statute on child

custody (PKPA). Rather than upset the balance between the federal and state judicial

responsibilities, affording jurisdiction to properly construe the statute will better facilitate

the inter-jurisdictional crises that have arisen to date.

Under 28 U.S.C. § 1738A(e),

> "Before a child custody or visitation determination is made, reasonable notice and opportunity to be heard shall be given to the contestants, any parent whose parental rights have not been previously terminated and any person who has physical custody of a child".

As evident from the countless decisions demonstrating conflict as to what is proper notice

and when it may be given, there is a dramatic need for federal uniformity. The due

process interests in proper reasonable notice and the opportunity to be heard must be

uniform so that the different states may properly implement the federal statute.

Thus, Ms. Holden respectfully requests the Court to reopen her case and determine as a

matter of federal law that:

1.)    no transfer of a child between states should take place based upon a default judgment where the issue of proper notice has been called into question;

2.)    any judgment or order from one state must be presented and recorded in the second state so that any process involving the movement of a child is administered under the receiving state's enforceable jurisdiction;[19]

3.)    an opportunity for a proper hearing must be afforded in that state before the child can be removed, even if such hearing need not be evidentiary;[20] and,

4.)    in the resolution of any conflicting issues of jurisdiction, the communications between the courts of the different states must be made of record.

### *CONCLUSION*

None of these safeguards were afforded to Ms. Holden. As a result, she suffered the indignation of the deprivation of her constitutional right to the care custody and companionship of her son, Quinn. Accordingly, this court should, exercise its discretion to find jurisdiction over the constitutional claims by Ms. Holden so that the foregoing issues may be properly determined. The absence of any definitive and clear law on these subjects that apply under any of the uniform statutes, makes it more imperative for this court to afford the forum for the proper determination of these matters that have been deemed to be "the oldest of the fundamental liberty interests recognized by this court." *Troxol v. Garville,* 530 U.S. at 65.

---

[19] *See* Gen. Laws. Ch. 209B § 12(a).
[20] *See. Khan v. Sammini, supra.*

Thus, the Plaintiff Luisa Holden respectfully requests that the court grant her motion pursuant to Mass.R.Civ.P. 60(b)(6) so that these critical and important issues may be determined.

Respectfully submitted,
Luisa Hayward Holden

By her attorney,


 /s/ *Jeffrey A. Denner*
Jeffrey A. Denner, BBO #120520
Paul Andrews, BBO #558574
Denner Pellegrino, LLP
Four Longfellow Place
Boston, MA 02114-1634


Dated: March 15, 2007

### CERTIFICATE OF SERVICE

      I, Paul Andrews, hereby certify that a true copy of the foregoing document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), if any, and will be sent to the non-registered relevant participants by mailing upon the parties appearing in this action by mailing to Clive Cardozo, P.O. Box 362, Quogue, NY, 11950 and Leonard H. Kesten, One Exeter Plaza, 12th Floor, Boston, MA, 02116 first class postage prepaid on this 15th day of March, 2007.

                            __*/s/ Paul Andrews*_____
                             Paul Andrews